UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



MAR 2 8 2018

Harleysville Worcester Insurance Company,

Plaintiff,

—v—

Wesco Insurance Company, Inc. *et al.*,

Defendants.

16-CV-7304 (AJN)

MEMORANDUM
OPINION & ORDER

ALISON J. NATHAN, District Judge:

After a truck carrying contaminated milk further contaminated several hundred thousand pounds of milk and cheese in a cheese-making plant, litigation ensued. The transport company that delivered the contaminated milk had an insurance policy with each of the parties to this action. Plaintiff Harleysville Worcester Insurance Company ("Plaintiff" or "Harleysville") defended its insured in the underlying litigation; Defendant Wesco Insurance Company, Inc. ("Defendant" or "Wesco") disclaimed coverage. In this case, Harleysville seeks reimbursement from Wesco for the costs to defend and indemnify the transport company, including the costs of settling the underlying actions. Now before the Court is Plaintiff's motion for summary judgment and Defendant's cross-motion to withdraw any deemed admissions.

For the reasons that follow, the Court GRANTS Plaintiff's motion for summary judgment and DENIES as moot Defendant's cross-motion to withdraw any deemed admissions.

## I. BACKGROUND

The following facts are undisputed except as otherwise noted.

1

**A. The Parties and the Insurance Policies**

Plaintiff Harleysville and Defendant Wesco are both insurance companies and had issued policies to Bernard Thomas Sr. and Penny Thomas, business partners and co-owners doing-business-as M&T Transport ("M&T"). *See Great Lakes Cheese of New York, Inc. v. Agri-Mark, Inc.*, No. 14-CV-232 (GTS), 2016 WL 5717337, at *3 (N.D.N.Y. Sept. 30, 2016). M&T is a hauler of milk and milk products for various milk suppliers. *Id.* at *2.

Harleysville issued M&T a commercial general liability policy for the policy period from November 1, 2012 through November 1, 2013, with limits of $1 million per occurrence. Statement of Undisputed Material Facts in Support of Harleysville's Motion for Summary Judgment ("Pl. 56.1"), Dkt. No. 52, ¶ 1; Declaration of Jeffrey A. Beer Jr. ("Beer Decl."), Dkt. No. 48, Ex. A. The Harleysville policy covers "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies," but includes an exclusion for "'bodily injury' or 'property damage' arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft owned or operated by or rented or loaned to any insured." *See* Beer Decl., Ex. A, at I.1.a, I.2.g. The exclusion specified that "use" includes "operation and 'loading or unloading.'" *Id.* at I.2.g.

Wesco issued a commercial business auto policy to M&T for the policy period from January 20, 2013 through January 20, 2014, with limits of $1 million per occurrence. Pl. 56.1 ¶ 2; Beer Decl., Ex. B. The Wesco policy covers "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" Beer Decl., Ex. B, at II.A. The policy includes an exclusion for property damage involving "property

2

owned or transported by the 'insured' or in the 'insured's' care, custody, or control." *Id.* at II.B.6.

### B. The Precipitating Incident and the Underlying Actions

In June 2013, one of the milk trailers belonging to M&T was damaged in a roll-over accident while hauling milk. Defendant's Statement of Additional Material Facts ("SAMF"), Dkt. No. 64, ¶ 1.[1] M&T used Blue Grass Tank & Equipment ("Blue Grass") for repairs. SAMF ¶ 2. Upon the trailer's return after its repairs, Thomas Sr. directed an M&T employee to power-wash the trailer from within to remove any debris left from the repair. SAMF ¶ 5. This employee did not pull the valves off the service lines that run from the tanks to the rear of the trailer before he performed this cleaning. SAMF ¶ 6. Thomas Sr. saw "red dirt" coming out of the discharge manifold of the trailer, which he later stated was consistent with the work Blue Grass performed. SAMF ¶ 7.

By regulation, M&T is required to wash its trailers with brushes and a chlorinated cleaner before picking up milk. SAMF ¶ 8. Dairy plants wash the trailers' interiors prior to loading product, although this service can be performed at any dairy, whether or not the trailer is picking up milk there. SAMF ¶¶ 9-10. Whenever and wherever a trailer is washed, a "wash tag" is issued without which milk may not be picked up. SAMF ¶ 11. Thomas Sr. testified that he took the trailer to Queensboro Farm Products, Inc. ("Queensboro") for a machine wash and to receive a wash tag on August 12, 2013, however Queensboro's employees testified that the trailer was never washed there and that milk haulers often take their wash tags without having their trailers

---

[1] As Defendant's counter-statement of facts in opposition to Plaintiff's facts, and statement of additional material facts are part of the same document, *see* Dkt. No. 64, with paragraph numbers that repeat, the Court will differentiate by labeling counter-statement cites as Defendant's 56.1 Statement ("Def. 56.1"), and its statement of additional material facts as noted in text above.

washed. SAMF ¶¶ 12-15. The absence of a wash tag is sufficient grounds to reject a trailer attempting to make a pickup or delivery. SAMF ¶ 17.

On August 14, 2013, M&T used the milk trailer to transport milk for the first time since the repairs were made. Pl. 56.1 ¶ 3. Agri-Mark, Inc. ("Agri-Mark") hired M&T to travel to Agri-Mark's facility, load milk into the milk trailer, and deliver the milk to Agri-Mark's customer, Great Lakes, at its cheese plant in Adams, New York. Pl. 56.1 ¶ 4. The milk delivered by M&T was unloaded through pipes into Great Lakes' plant and was mixed with other milk at the plant. Pl. 56.1 ¶ 5.

Shortly thereafter, a Great Lakes operator disconnected the lines through which milk was being pumped and observed what appeared to be debris. SAMF ¶ 24. Upon further investigation, Great Lakes determined that the contamination spread to other parts of their plant, including an entire cheese making line. Pl. 56.1 ¶¶ 5-6; SAMF ¶¶ 23-27. Great Lakes' "milk receiver" testified that he did not check for a wash tag, and the wash tag for the trailer was never located. SAMF ¶¶ 16, 18-19. Based on the contamination incident, Great Lakes submitted a claim to its comprehensive general liability carrier (which also happens to be Harleysville) for property damage totaling $957,650.21. Def. 56.1 ¶ 7.

After the incident, Great Lakes filed two actions, one in federal court and one in state court (together, the "Underlying Actions"). Pl. 56.1 ¶ 8. In the Underlying Actions, Great Lakes claimed damages of approximately $966,000 due to loss of cheese, milk, and other products at the plant, the cost of storage of the contaminated cheese, the cost of cleaning, sanitizing and inspecting the plant, the opportunity cost of plant down-time, and the diversion of milk as a result of the contamination. Pl. 56.1 ¶ 9; Beer Decl., Exs. C (state court complaint) & G (federal court complaint). In the state court action against M&T, Great Lakes also claimed continuing

4

damages and sought reimbursement for the cost of storage, pre-judgment interest, attorneys' fees and punitive damages. Beer Decl., Ex. C. In the federal action, Great Lakes sued Agri-Mark, who, in turn, brought a third-party complaint against M&T. *See* Beer Decl., Exs. G & H (third-party complaint).

### C. Defending M&T in the Underlying Actions

Harleysville was first notified of the contamination incident on August 20, 2013. By letter dated December 30, 2013, Harleysville notified M&T that it was investigating the claims. Beer Decl., Ex. N. After the Underlying Actions were filed, Harleysville wrote M&T again on April 15, 2014, disclaiming its duty to indemnify M&T, but stating that it would defend M&T "for the entire complaint." *Id.* at HWIC00645-HWIC00646. Harleysville agreed to provide M&T a defense in the Underlying Actions under a complete reservation of rights to deny coverage. Pl. 56.1 ¶ 14.

On or about September 23, 2013, M&T notified Wesco of the contamination incident. SAMF ¶ 34. By letter dated November 6, 2013, Wesco denied coverage to M&T for any liability arising out of the incident. Def. 56.1 ¶ 12; Pl. 56.1 ¶ 13; Beer Decl., Ex. M. At the time Wesco disclaimed coverage, the Underlying Actions had not yet been filed. *See* Beer Decl., Ex. M, at HWIC00675. The parties dispute when Wesco received notice of the Underlying Actions, which were filed on March 3, 2014 (federal court action), April 3, 2014 (third-party federal action) and December 17, 2015 (state court action). *See* First Amended Complaint, Dkt. No. 44, ¶¶ 10, 15, 20. Harleysville claims to have sent a copy of the third-party complaint against M&T to Wesco on April 14, 2014. Pl. 56.1 ¶ 16 (citing Beer Decl., Ex. P). Wesco claims it was not notified of any of the actions until January 19, 2016, when M&T's personal counsel transmitted a letter demanding that Wesco immediately assume M&T's defense and indemnification in both

5

actions. SAMF ¶ 51 (citing Declaration of Josh H. Kardisch ("Kardisch Decl."), Dkt. No. 61, Ex. Q).

Represented by counsel hired by Harleysville, M&T asserted various affirmative defenses and cross-claims in the Underlying Actions arguing that Great Lakes or other defendants were responsible for the alleged harm. SAMF ¶¶ 41, 43-44. Bluegrass and Queensboro were dismissed from the Underlying Actions by stipulation on October 8, 2015 and January 8, 2016, respectively. SAMF ¶¶ 49-50.[2]

On April 29, 2016, Harleysville informed Wesco that it would commence a declaratory judgment action against Wesco unless Wesco agreed to cover M&T in the Underlying Actions. Beer Decl., Ex. R. Further, on October 14, 2016, Harleysville's counsel sent Wesco a letter advising that the Judge in the Northern District case had ordered that the parties engage in "meaningful settlement discussions," asserting that Harleysville was not required to defend and indemnify M&T in either action as its policy excluded coverage for "property damage" caused by an "auto," and arguing that Wesco was required to defend both actions. SAMF ¶ 56 (citing Kardisch Decl., Ex. S). Wesco responded by email on November 11, 2016, stating that as Wesco had not received any material information aside from the basic allegations, it could not possibly be in a position to make a settlement recommendation. SAMF ¶ 59 (citing Kardisch Decl., Ex. V).

On December 16, 2016, a settlement conference was held in the federal court action, attended by counsel for Great Lakes, Agri-Mark, M&T, Wesco, and Harleysville. Pl. 56.1 ¶ 22. Great Lakes' settlement demand was $1.5 million, and Agri-Mark refused to contribute to a global settlement above a nominal amount. Pl. 56.1 ¶ 23. After extensive all-day negotiations

---

[2] For more background on the Underlying Actions, see Judge Suddaby's order denying summary judgment. *Great Lakes Cheese*, 2016 WL 5717337.

facilitated by the Honorable Glenn T. Suddaby, United States District Judge for the Northern District of New York, the Underlying Actions were fully settled at the conference, with M&T agreeing to pay $1,025,000 (with Harleysville paying $1,000,000, and M&T paying $25,000, a sum later reduced to $12,500), and Agri-Mark agreeing to pay $50,000. Pl. 56.1 ¶ 24. As part of the settlement, Agri-Mark released all third party claims it asserted against M&T. *Id.* Wesco did not contribute to the settlement. *Id.* M&T assigned to Harleysville "all of M&T's rights, claims for relief and causes of action against Wesco with respect to the Underlying Action." Pl. 56.1 ¶ 30. During the conference, Judge Suddaby opined that the settlement range being discussed was "perfectly reasonable," while adding that his opinion was ultimately "of no moment." Pl. 56.1 ¶ 27; Def. 56.1 ¶ 27.

### D. The Present Action

Prior to the settlement, Harleysville commenced the instant action on September 19, 2016, seeking a declaratory judgment that it has no obligation to defend or indemnify M&T in the Underlying Actions, seeking a declaratory judgment that Wesco has that obligation, and seeking reimbursement from Wesco for all amounts Harleysville has paid to defend M&T. Dkt. No. 1. On January 27, 2017, Plaintiff filed its first amended complaint, additionally seeking reimbursement for all amounts that Harleysville and M&T paid in settling the Underlying Actions. Dkt. No. 44. On February 2, 2018, Wesco answered the amended complaint, asserting a counterclaim for declaratory judgment as well. Dkt. No. 45. On June 2, 2017, Plaintiff filed the instant motion, moving for summary judgment. Dkt. No. 47. On July 27, 2017, Wesco moved to withdraw any deemed admissions to Plaintiff's first requests for admissions during discovery. Dkt. No. 63.

## II. LEGAL STANDARD

Summary judgment may be granted to the movant if, upon reviewing the parties' submissions in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely "in dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252. That is, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt...and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted). As a general matter, in cases of this nature, "whether an insurer has an obligation to defend is a question of law for the courts." *Burt Rigid Box Inc. v. Travelers Prop. Cas. Corp.*, 126 F. Supp. 2d 596, 634 (W.D.N.Y. 2001), *aff'd in part, rev'd in part on other grounds*, 302 F.3d 83 (2d Cir. 2002).

As the Court is sitting in diversity for this case, New York state choice-of-law rules apply. *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 582 (2013). Because the Wesco and Harleysville policies were both issued in New York to a New York based company, New York law applies to this case. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 10 F. Supp. 3d 460, 496 (S.D.N.Y. 2014); *Avondale Indus., Inc. v. Travelers Indem. Co.*, 774 F. Supp. 1416, 1422 (S.D.N.Y. 1991).

## III. DISCUSSION

Harleysville's argument for summary judgment is quite simple. According to Harleysville, it is undisputed in the underlying action that Great Lakes' plant was damaged by the contaminated milk that M&T delivered. Wesco, having provided automobile insurance that covers the operation of the M&T milk trailer in question, had a duty to defend M&T in the underlying action. Harleysville, by contrast, did not have that duty because of the automobile exclusion contained in its policy with M&T. Yet Wesco did not defend M&T, despite having notice of the claim and, later, of the litigation. Harleysville did defend M&T. As a result, Wesco now owes Harleysville reimbursement for the costs it expended in its defense and for the reasonable settlement of the claims against M&T.

Wesco disputes each of Harleysville's statements. Wesco contends that it had no duty to defend or indemnify M&T under the provisions in its policy because: 1) the pleadings in the Underlying Actions did not allege property damage caused by an "accident;" 2) the pleadings in the Underlying Actions did not allege an accident resulting from the "ownership, maintenance or use" of the milk trailer; and 3) the pleadings in the Underlying Actions alleged property damage that falls with the policy's "care, custody and control" exclusion of the policy. In asserting these arguments, Wesco contends that because no final determination was made as to M&T's liability in the Underlying Actions, factual issues remain that bear on Wesco's duty to indemnify. Alternatively, Wesco contends that even if it breached its duty to defend and indemnify, it should be excused from reimbursement both because it did not receive timely notice of the Underlying Actions and so was prejudiced in its ability to investigate or defend the claim, and because the settlement amount was not reasonable.

**A. Duty to Defend**

The Court begins with Harleysville's argument that Wesco breached its duty to defend M&T in the Underlying Actions. Under New York law, "[a]n insurer's duty to defend its insured is exceedingly broad." *Regal Constr. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 15 N.Y.3d 34, 37 (2010) (internal quotation marks omitted). The Second Circuit, interpreting New York law, has held that this "duty…is broader than [the insurer's] duty to indemnify." *Burt Rigid Box, Inc.*, 302 F.3d at 97. While the duty to indemnify is generally adjudicated at the end of the proceeding, an "insurer will be called upon to provide a defense whenever the allegations of the complaint suggest a reasonable possibility of coverage." *Regal*, 15 N.Y.3d at 37 (internal quotation marks and alteration omitted). That is, the duty to defend "arises whenever the allegations within the four corners of the underlying complaint *potentially* give rise to a covered claim." *Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.*, 91 N.Y.2d 169, 175 (1997) (internal quotation marks omitted; emphasis added). "If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be." *Century 21, Inc. v. Diamond State Ins. Co.*, 442 F.3d 79, 83 (2d Cir. 2006) (internal quotation marks omitted). Moreover, even if the complaints were *ambiguous* as to a fact material to coverage, the ambiguity must be resolved in favor of the insured. *Int'l Bus. Machs. v. Liberty Mut. Fire Ins. Co.*, 363 F.3d 137, 144 (2d Cir. 2004).

Based on the allegations made in the complaints in the Underlying Action, Wesco had a duty to defend M&T. Wesco's policy with M&T covers property damage caused by an accident and resulting from the use the milk trailer. Beer Decl., Ex. B, at II.A. In Great Lakes' complaint against M&T, in the very first paragraph the plaintiffs alleged "[t]his Complaint arises out of the

recklessly indifferent and grossly negligent conduct of Defendants [M&T Transport], who contaminated and then delivered a shipment of milk to Plaintiff[.]" Beer Decl., Ex. C, ¶ 1. The Complaint, in pleading a cause of action of negligence, continues that Great Lakes suffered damages as a proximate result of M&T using the milk trailer in question for its shipment "despite the fact that the trailer contained the Metal Contaminant...and despite the fact that, after the June 2013 accident, the trailer was given only a deficient hand-washing by M&T Transport's untrained employee." *Id.* ¶¶ 51-56. In Agri-Mark's third party claim against M&T, again, M&T was alleged to have caused any damages through its negligence in, among other things, "negligently permitting milk to be loaded into a trailer that had not been properly cleaned and/or sanitized; failing to properly transport the milk in a manner to prevent contamination; failing to deliver the milk in the condition it was received[.]" Beer Decl., Ex. H, ¶ 17. Both complaints, in alleging that M&T caused property damage by accidentally and negligently delivering contaminated milk through its use of the covered milk trailer, clearly, at the very least "*potentially* [gave] rise to a covered claim." *Frontier Insulation*, 91 N.Y.2d at 175 (internal quotation marks omitted; emphasis added). As a result, Wesco had a duty to defend M&T, and owes Harleysville for its reasonable costs of defense. No reasonable juror could find otherwise.

Wesco's argument that it had no duty to *defend* M&T is one and the same as its argument that it had no duty to *indemnify* M&T. Specifically, Wesco argues that its policy with M&T did not cover the incident because it was not an "accident," did not result from the "ownership, maintenance or use" of the trailer, and because Wesco received no timely notice of the litigation. The Court addresses these arguments below.

For purposes of considering Wesco's duty to defend, however, it is sufficient to conclude that there is no genuine material dispute that the allegations in the pleadings of the Underlying

Actions at least potentially brought the incident within the auspices of Wesco's policy with M&T. "[A]n insurer can be relieved of its duty to defend [only] if it establishes as a matter of law that there is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision." *Allstate Ins. Co. v. Zuk*, 78 N.Y.2d 41, 45 (1991) (citation omitted). As a matter of law, Wesco cannot meet this high burden.

## B. Duty to Indemnify

The Court's inquiry does not end with the duty to defend; the duty of Wesco to indemnify M&T is separate and apart from its duty to defend. Unlike the duty to defend, which is "measured against the allegations of pleadings," the duty to indemnify is "determined by the actual basis for the insured's liability to a third person." *Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford*, 64 N.Y.2d 419, 424 (1985) (citations omitted); *accord Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 115 (2d Cir. 2005). Although the Court concludes that Wesco breached its duty to defend M&T, a party's breach of the duty to defend "does not entail an obligation to pay the settlement amount in the absence of a duty to indemnify." *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 83 (2d Cir. 2013). In *Servidone Construction*, the New York Court of Appeals held that "an insurer's breach of [its] duty to defend does not create coverage and that, even in cases of negotiated settlements, there can be no duty to indemnify unless there is first a covered loss." *Servidone*, 64 N.Y.2d at 423. Accordingly, Wesco may still litigate the validity of its disclaimer. *See K2 Inv. Group, LLC v. American Guar. & Liab. Ins. Co.*, 22 N.Y.3d 578, 585-86 (2014). However, having breached its duty to defend, "the burden is on the insurer to establish that the loss was not covered by the policy," *Servidone*, 64 N.Y.2d at 421, and Wesco may not relitigate issues in the Underlying Actions. *See K2 Inv. Group*, 22 N.Y.3d at 585.

As briefly previewed above, Wesco makes a number of arguments for why the incident was not covered by its policy with M&T. Wesco's policy with M&T states that Wesco "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance, or use of a covered 'auto.'" *See* Kardisch Decl., Ex. AA. This means that the policy provides coverage for "property damage" only if it is both "caused by an 'accident'" and results "from the 'ownership, maintenance, or use' of the covered 'auto.'" Wesco does not dispute that the truck at issue was a covered auto, nor that property damage resulted, but does dispute both the presence of an "accident" as defined by the policy, and that the accident resulted from "use" or "maintenance" of the vehicle. Defendant Wesco's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Its Cross Motion ("Opp."), Dkt. No. 62, at 15-25. Based upon these arguments, Wesco claims it correctly disclaimed coverage and is not required to reimburse Harleysville now.

Alternatively, if the Court were to reject Wesco's interpretation of "accident" and "ownership, maintenance, or use," Wesco raises a third argument for why the policy did not provide coverage for the incident. Wesco contends that the underlying actions fell within the so-called "care, custody or control" exclusion in the policy. Under this exclusion, the policy does not apply to damage to "property owned or transported by the 'insured' or in the 'insured's' care, custody or control." Opp. at 24 (quoting Kardisch Decl., Exhibit AA, at II.B.6).

Fourth and finally, were the Court to conclude that, on the basis of uncontroverted facts, Wesco owed M&T a duty to indemnify as a matter of law, Wesco contends that it is still excused from covering M&T because of the prejudice it suffered from allegedly receiving late notice of the Underlying Actions.

The Court addresses these four arguments in turn.

### 1. The Underlying Incident Qualifies as an "Accident"

Wesco's first argument with respect to the definition of "accident" is unpersuasive. As stated above, M&T's policy with Wesco only provides coverage for "property damage" if it is "caused by an 'accident.'" Wesco's policy with M&T defines "accident" to "*include* continuous or repeated exposure to the same conditions resulting in 'bodily injury' or 'property damage.'" Kardisch Decl., Ex. AA, at V.A (emphasis added). Wesco argues that because the allegations in the Underlying Actions did not include "a continuous or repeated exposure," that the definition of accident is not met. Opp. at 17. However, a provision that broadens the term "accident" to also *include* a situation of repeated exposure does not limit the definition to *only* covering those types of accidents.

Relying on a New York Court of Appeals decision in *Michaels v. City of Buffalo*, 85 N.Y.2d 754, 758 (1995), Wesco next argues that "accident" refers to "an event involving some trauma, violence, or casualty, or application of external force in which the auto is involved." Opp. at 17. According to Wesco, the Underlying Actions did not allege an incident fitting that definition. But the Court of Appeals did not create such a rigid definition; instead, it held that the word "accident" must be defined by relation to the "reasonable expectation and purpose of the ordinary business person when making an ordinary business contract" and "is not given a narrow, technical definition by the law." *Id.* at 757 (quotation marks and citation omitted); *accord State Farm Mut. Auto. Ins. Co. v. Langan*, 16 N.Y.3d 349, 354-55 (2011).

Under this broader understanding, there is no material dispute that the contamination incident qualifies as an "accident" for purposes of Wesco's policy with M&T. In *Michaels*, the court found that the mechanical failure of an ambulance was not an accident, because the average

person purchasing automobile insurance "would not presume that damages arising from mechanical failure and delay would be insured against." *Id.* at 757-58. By contrast, the contamination incident alleged in the Underlying Actions was unexpected and unforeseen, and, there exists no genuine dispute as to the fact that an ordinary business person entering into a policy covering a milk trailer would reasonably expect the policy to cover accidents caused by its operation in delivering milk, not only by its operation on the road.

Further, as Harleysville notes, even if the Court were to adopt the narrow definition Wesco contends is compelled by *Michaels*, "casualty" may be defined as "[a] person or thing injured, lost, or destroyed." Black's Law Dictionary (10th ed. 2014). Here, Great Lakes' plant was a "thing injured" by the introduction of contaminant from M&T's milk trailer, which constitutes an "external force in which the auto is involved." *Michaels*, 85 N.Y.2d at 758. Finally, under New York law "any ambiguity regarding the definition of 'accident' should be resolved against the insurer." *State Farm Mut. Auto. Ins. Co. v. Bush*, 362 N.Y.S.2d 220, 223 (N.Y. App. Div. 1974) (citing *Hartol Prods. Corp. v. Prudential Ins. Co.*, 290 N.Y. 44, 49 (1943)).

Thus, based on the uncontroverted evidence, no reasonable jury could conclude that the contamination incident does not qualify as an accident under the terms of Wesco's policy.

### 2. The Underlying Incident Resulted from the "Use" of the Trailer

Wesco's second argument for why its policy with M&T does not cover the underlying events centers on whether the accident resulted from the "use" or "maintenance" of the covered automobile. When it comes to defining "use" under New York law, the parties agree that: 1) the accident must arise from the "inherent nature" of the automobile; and 2) that the automobile must produce the injury, which is established by showing negligence in the use of the vehicle.

*See* Harleysville's Memorandum of Law in Support of Its Motion for Summary Judgment

("Mot."), Dkt. No. 53, at 13 (quoting *Empire Ins. Co. v. Schliessman*, 763 N.Y.S.2d 65, 66 (N.Y.

App. Div. 2003) and *Somers Central Sch. Dist. v. Lumbermen Mut. Cas. Co.*, 774 N.Y.S.2d 824,

825 (N.Y. App. Div. 2004)); Opp. at 17 (quoting *Zaccari v. Progressive N.W. Ins. Co.*, 827

N.Y.S.2d 204, 206 (N.Y. App. Div. 2006) and *Matter of Emcompass Indem. Co. v. Rich*, 14

N.Y.S.3d 491, 493 (N.Y. App. Div. 2015)). "Negligence in the use of the vehicle must be

shown, and that negligence must be a cause of the injury." *Empire Ins. Co.*, 763 N.Y.S.2d at 66

(quoting *Argentina v. Emery World Wide Delivery Corp.*, 93 N.Y.2d 554, 562 (1999)); *accord*

*Zaccari*, 827 N.Y.S.2d at 207.

On the first issue here – whether the accident arose from the "inherent nature" of the

automobile – there exists no material dispute. New York courts have held that "use"

encompasses the "complete operation" of a vehicle, including not just the transport but also the

loading and unloading of its cargo. *See, e.g.*, *Paul M. Maint., Inc. v. Transcon. Ins. Co.*, 755

N.Y.S.2d 3, 5 (N.Y. App. Div. 2002); *Axton Cross Co. v. Lumbermen's Mut. Cas. Co.*, 574

N.Y.S.2d 561, 562 (N.Y. App. Div. 1991); *Wagman v. Am. Fid. & Cas. Co.*, 304 N.Y. 490, 494

(1952). The unloading of the contaminated milk from the truck to the Great Lakes plant arises

from the "inherent nature" of the vehicle. No reasonable juror could find otherwise.

Turning to the second prong of the definition of "use" – whether negligence was the

cause of the injury – both parties misstate the question. Harleysville contends that there "is no

*bona fide* factual dispute regarding whether the contamination incident resulted from the

maintenance and/or use (including loading/unloading) of M&T's milk trailer," citing to reports

and testimony produced in discovery in the underlying action. Harleysville's Memorandum of

Law in Further Support of Its Motion for Summary Judgment ("Reply"), Dkt. No. 74, at 6-7.

But even assuming the contamination in the trailer caused the damage, that does not establish *negligence*. Wesco counters that "the allegedly contaminated milk, and neither the trailer nor its negligent use, was purportedly responsible for Great Lakes' (and by extension Agri-Mark's) harm." Opp. at 20. But the key here is how the contaminated milk *came to be* contaminated, and whether that is the result of negligence by M&T related to their trailer. Harleysville offers an incisive analogy to a drug store which delivers a spoiled drug. Reply at 8, n.3. If the drug was spoiled and all the vehicle did was deliver it to the customer, the store's auto policy might not provide coverage for the customer's resulting illness. However, if the drug spoiled *because* the refrigeration system in the vehicle failed, the drug store would be covered for the resulting illness.

The Court finds no genuine material dispute exists regarding whether *negligence* in the use of the milk trailer caused the injuries to Great Lakes. In the Underlying Actions, M&T attempted to raise issues about the behavior of Great Lakes – in failing to check for a wash tag before delivery, or in failing to shut down certain lines to mitigate contamination – and about the behavior of Blue Grass and Queensboro – for creating the metal contaminants and not cleaning them, respectively. *See* Kardisch Decl., Ex. N, ¶¶ 53-57, 71. However, the attorney Harleysville hired to defend M&T in the Underlying Actions argued for comparative negligence, meaning that M&T was negligent, even if other actors potentially were as well. Kardisch Decl., Ex. O. This concession of negligence was supported by M&T's own expert, Douglas C. Adams, President of Prime Consulting Group, Inc. Mr. Adams was retained to evaluate the damages claim, and while his report concluded that Great Lakes was responsible for some *portion* of the damages, in part because it "accepted the M&T load without a 'wash tag,'" *see* Kardisch Decl.,

17

Ex. P, at 6-8, implicit in Mr. Adams' report is that while Great Lakes may have failed to contain the damage, M&T was still negligent in delivering the contaminants.

Even now, after discovery in this action, Wesco does not argue that M&T was not negligent at all. Wesco argues that Blue Grass caused the existence of the metal shavings and that Queensboro failed to sufficiently clean the trailer, *see* Opp. at 12, however, this does not account for the responsibility M&T had in ensuring that it did not contaminate its cargo. At no point does Wesco offer any support for its implied contention that M&T's actions in bringing the trailer to Queensboro for washing (if that happened) were sufficient to satisfy its duty of reasonable care and absolve it of liability under a negligence theory. Perhaps unsurprisingly, Judge Suddaby – while not making a determination as to negligence – commented that "M&T's argument that it is free from liability appear tenuous, particularly in light of the evidence marshaled by Agri-Mark." *Great Lakes Cheese*, 2016 WL 5717337 at *13, n.16.

Wesco attempts to defeat summary judgment by raising factual issues from the Underlying Actions here, but based on the undisputed evidence, M&T was at least partially negligent, and any reasonable juror would find that negligence in the use of the trailer was at least partially the cause of the injury. Wesco asserts that "[s]ince there was never a determination in the underlying action as to how the milk became 'contaminated', much less whether M&T's acts or omissions in the use of the trailer caused or contributed to said condition, there are at the very least questions of fact which preclude summary judgment on the issue of coverage herein." Opp. at 20-21. Yet the mere fact that a final determination implicating *res judicata* was never made in the Underlying Actions is not sufficient to find a *genuine* issue of material fact here. While in the context of declaratory judgment actions, courts generally find it premature to establish a duty to indemnify if the underlying action is still pending, there is no *per*

*se* rule. *Atl. Cas. Ins. Co. v. Value Waterproofing, Inc.*, 918 F. Supp. 2d 243, 261-62 (S.D.N.Y. 2013). Where, as here, the purpose of that general practice – to avoid consideration of a factual dispute still at issue in the underlying action – would not be served, courts will still make a determination of duty. *See, e.g., id.*; *Beazley Ins. Co., Inc. v. Ace Am. Ins. Co.*, 150 F. Supp. 3d 345, 355, n.12 (S.D.N.Y. 2015).

Here, there is no genuine factual dispute that M&T was at least partially negligent, thus bringing the incident within the terms of Wesco's policy as an accident resulting from the "use" of the milk trailer. Defendant has shown no more than "metaphysical doubt" that M&T might not be negligent, *Brown*, 654 F.3d at 358, and its arguments are more reasonably understood as arguments for *comparative* negligence than as arguments negating M&T's own negligent behavior. For the purposes of determining when the definition of "use" of the vehicle as set forth in Wesco's policy encompasses this type of incident, no reasonable jury would find M&T entirely free of negligence.

### 3. The "Care, Custody, and Control" Exclusion Does Not Apply

Wesco's third argument as to why its policy with M&T does not cover this incident fails as well. Section II.B.6 of Wesco's policy with M&T excludes coverage for "property damage" to "property owned or transported by the 'insured' or in the 'insured's' care, custody or control." Kardish Decl., Ex. AA. The parties agree that the milk M&T was transporting was within its care, custody, or control, but this is irrelevant, given that Great Lakes never paid for this milk and, thus, it was not part of the damages Great Lakes sought. *See* Mot. at 19-20; Pl. 56.1 ¶ 10. However, Wesco argues that the exclusion goes further, covering the "alleged damage to the plant" because it is "a natural consequence and flows directly from the cargo within M&T's 'care, custody and control.'" Opp. at 25.

A plain text reading of the contractual provision does not support Wesco's attempt to broaden the exclusion. Great Lakes' plant, milk, and cheese were never in the "care, custody or control" of M&T, and no evidence exists in this record that suggests that a party entering into a commercial business auto policy for a milk trailer would expect the exclusion to apply beyond the cargo to all "natural consequences" of the cargo's delivery.

Moreover, Wesco's argument lacks support in the law. When the Second Circuit was faced with interpreting the care, custody or control exclusion, albeit in the context of a landlord-tenant policy, the court found the exclusion applies "[w]here the insured has sufficient possessory dominion over the property damaged." *Monari v. Surfside Boat Club Inc.*, 469 F.2d 9, 12 (2d Cir. 1972). M&T has absolutely no possessory dominion over the cheese, other milk, or plant equipment that form the core of Great Lakes' alleged damages. Wesco offers no case law supporting its extension of the exclusion to what "flows directly" from the property in its care, custody or control, nor can the Court find any basis in the law or in the plain text of the exclusion.[3] Based on the uncontroverted evidence, no reasonable jury could conclude that the exclusion applies.

### 4. Wesco Is Not Excused from Its Duty by Reason of Untimely Notice

Having determined that, on the basis of the undisputed evidence, Wesco's policy *did* cover M&T for the incident as a matter of law, the Court turns to Wesco's final argument for why it should be relieved of its duty to indemnify M&T. Wesco contends that even if it had a duty to M&T under the terms of its policy, because it did not receive timely notice of the

---

[3] In its initial disclaimer letter to M&T, Wesco also disclaimed coverage based on the "Handling of Property" exclusion. *See* Kardisch Decl., Ex. J. Harleysville addressed this possible grounds for exclusion in its motion for summary judgment, *see* Mot. at 20-21, but as Wesco does not raise the argument in its opposition, the argument is deemed waived.

underlying litigation it was impaired from conducting a thorough investigation and providing a suitable defense, a prejudice that vitiates the contract. Opp. at 26-35.

Section 3420(c) of New York's Insurance Law allows an insurer to disclaim coverage if it was prejudiced as a result of a failure to provide timely notice. N.Y. Ins. Law § 3420(c)(2)(A). New York law previously allowed insurers to deny coverage on the basis of late notice without regard for whether the late notice caused any prejudice. In 2008, however, the law was amended, and under sections 3420(a)(5) and (c)(2)(C), the insurer carries the burden of proving both that there was a failure of timely notice *and* that this failure "materially impair[ed] the ability of the insurer to investigate or defend the claim." Thus, in order to appropriately deny coverage on this basis, Wesco must show it was prejudiced by the purported late notice.

According to Wesco, it first learned of the Underlying Actions in January 2016, when M&T's personal counsel, Peter Knych, forwarded the complaints. *See* Kardisch Decl., Ex. Q. Relying on contemporaneous notes from Harleysville's claim file, Plaintiff disputes this timeframe, asserting instead that Harleysville sent Agri-Mark's third party complaint to Wesco on April 14, 2014. Pl. 56.1 ¶ 16 (citing Beer Decl., Ex. P); Reply Declaration of Jeffrey A. Beer Jr., Esq. ("Beer Reply Decl."), Dkt. No. 72, Ex. B.

Nonetheless, assuming *arguendo* that Wesco is correct about the timing of the notice, it would still not be allowed to deny coverage, because no reasonable jury could conclude that Wesco carried its burden that the delayed notice "materially impair[ed]" its ability to "investigate or defend the claim." Wesco complains that by the time it was notified, discovery had been completed and monetary demands and offers were exchanged. Opp. at 32. Wesco further charges that it had to wait another 10 months to receive a complete copy of the file in the underlying matter. *Id.* In sum, Wesco argues that it was not provided materials in sufficient time

21

"to evaluate the strengths/weaknesses of Great Lakes' and Agri-Mark's claims, the value of each element of alleged property damage, or the relative benefits of settling versus trying the matter to verdict." *Id.* at 32-33.

However, on the basis of the full record of undisputed evidence before the Court, including Wesco's actions upon receiving notice of the lawsuits, Defendant's claim under § 3420(c) fails as a matter of law. Wesco did not seek additional information until roughly six months after it undisputedly received notice. *See* Kardisch Decl., Ex. R. What information it did seek then was limited to expert reports and Great Lakes' damages demand. *Id.* And Wesco did not suggest that it might disclaim coverage based on prejudice from untimely notice until November 2016, eleven months after receiving the complaints, and nearly seven months after Harleysville demanded that Wesco take over the defense of M&T. *See* Kardisch Decl., Ex. Y. While Wesco is not required to specifically "quantify its prejudice," Wesco has not argued that the outcome would have been more advantageous if it had received timely notice, let alone explained how. *Compare Wausau Underwriters Ins. Co. v. Old Republic Gen. Ins. Co.*, 122 F. Supp. 3d 44, 56 (S.D.N.Y. 2015) (finding no prejudice where party only makes conclusory assertions that it was materially impaired) *with Emigrant Bank v. Commonwealth Land Title Ins. Co.*, No. 15-CV-7593 (KMK), 2017 WL 4286335, at *13 (S.D.N.Y. Sept. 26, 2017) (finding prejudice where defendant specifically establishes the prejudice of being denied opportunities for recoupment caused by the delayed notice).[4] No reasonable juror could conclude that Wesco sufficiently established prejudice.

---

[4] Before insurers were required to show prejudice to properly disclaim coverage based on untimely notice, courts distinguished between cases such as this in which the insurer *had* received timely notice of the occurrence, but not of the ensuing legal action, from those in which the insurer received no notice. *See Kraemer Building Corp. v. Scottsdale Ins. Co.*, 25 N.Y.S.3d 718, 720 (N.Y. App. Div. 2016) (collecting cases). The Court of Appeals had observed that in those cases the "no-prejudice" rule had "less potency…because an insurer was able to protect its

* * *

Having breached its duty to defend, "the burden is on the insurer to establish that the loss was not covered by the policy." *Servidone*, 64 N.Y.2d at 421. Wesco has failed to carry its burden that its policy with M&T did not cover the underlying incident, and the Court concludes that Wesco breached its duty to indemnify M&T as a matter of law.

### C. The Settlement Was Reasonable and Plaintiff Is Entitled to Reimbursement in Full

While Wesco has breached both its duty to defend and duty to indemnify M&T, there are two remaining issues the Court must resolve before Harleysville is entitled to full reimbursement as a matter of law. "[U]nder New York law where an insurer, under a duty to defend, wrongfully refuses to do so, it is liable for its share of a reasonable settlement of the suit. It is also a well-settled principle in the law of contribution that when one party jointly liable on an obligation pays more than its pro rata share, it may compel the co-obligors to contribute their share of the amount paid." *Maryland Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 210 (2d Cir. 2000). Implicit in that declaration of equitable principle are two requirements. First, it must be determined that Harleysville had no duty to indemnify M&T itself, because if Harleysville's policy with M&T *also* covers an incident of this nature, Harleysville would be obligated to pay its fair share. Second, before the Court requires Wesco to reimburse Harleysville the full amount, the settlement amount must be deemed "reasonable."

---

interests due to its receipt of the separate no-fault claim." *Id.* (citing *Matter of Brandon [Nationwide Mut. Ins. Co.]*, 97 N.Y.2d 491, 496-98 (2002)). Wesco's undisputed timely receipt of the notice of the occurrence may be seen to have had a similar mitigating effect on any prejudice here.

23

### 1. Harleysville Had No Duty to Indemnify As a Matter of Law

For essentially the same reasons that Wesco's policy *does* cover M&T for the incident,

there can be no material dispute that Harleysville's general liability policy with M&T does *not*

provide coverage. The Harleysville policy contains an automobile exclusion stating that the

insurance does not apply to "'property damage' arising out of the ownership, maintenance or

use" of any auto owned or operated by its insured. Beer Decl., Ex. A. The exclusion specifically

states that "use" includes "loading and unloading" as well. *Id.* at I.2.g. As a result, and given the

above analysis, no reasonable juror could find that Harleysville's policy covers M&T for the

incident. *Accord Essex Ins. Co. v. Grande Stone Quarry, LLC*, 918 N.Y.S.2d 238, 240 (N.Y.

App. Div. 2011) (noting that "[i]n general, the liabilities excluded under the [commercial general

liability] insurance policy by reason of these provisions are covered under 'mirror image'

insuring agreements of automobile...policies." (quotation marks and citation omitted; first

alteration in original)).

### 2. The Settlement Amount Was Reasonable

Because Wesco's policy, and not Harleysville's, covers the underlying incident,

Harleysville is entitled to reimbursement for the costs it expended in defense of M&T. "[W]here

an insurer unjustifiably refuses to defend a suit, the insured may make a reasonable settlement or

compromise of the injured party's claim, and is then entitled to reimbursement from the insurer."

*Isadore Rosen & Sons v. Sec. Mut. Ins. Co. of N.Y.*, 31 N.Y.2d 342, 346 (1972) (internal

quotation marks omitted); *accord Turner Constr. Co. v. Am. Mfrs. Mut. Ins. Co.*, 485 F. Supp. 2d

480, 490-91 (S.D.N.Y. 2007). Put more simply, "[a]n insurer declines coverage at its own risk."

*Park Place Entn'mt Corp. v. Transcon. Ins. Co.*, 225 F. Supp. 2d 406, 413 (S.D.N.Y. 2002);

*accord Bunge Co. v. London & Overseas Ins. Co.*, 394 F.2d 496, 497 (2d Cir. 1968) ("It is well

settled that, at least after a denial of liability by an insurer, the insured may enter into a settlement with a third party without prejudicing its rights against the insurer."); *Servidone*, 64 N.Y.2d at 424 ("[A]n insurer cannot by virtue of its own breach escape liability for the reasonable settlement of a covered risk."). However, the court must still determine whether the settlement was *reasonable* "in view of the size of possible recovery and degree of probability of claimant's success against the insured." *Texaco A/S (Denmark) v. Commercial Ins. Co. of Newark, NJ*, 160 F.3d 124, 128 (2d Cir. 1998) (internal quotation marks and citations omitted).

There is no evidence in the record to establish that Harleysville did not negotiate for the lowest possible settlement, and in the absence of such evidence, no reasonable juror could conclude that the settlement amount was unreasonable. Wesco has not directly attempted to show that the settlement amount was unreasonable; instead, it relies on its attempts to raise a number of factual disputes addressed above to suggest some probability that M&T might have had a case for comparative negligence with Great Lakes, Queensboro, or Blue Grass.[5] Wesco raises no evidence here that would not have been factored into Harleysville's decisions when defending M&T and settling the Underlying Actions. And while the final settlement terms were reached *after* Harleysville filed its initial complaint in this court seeking reimbursement, Harleysville had no guarantee of recouping any of the money they expended in defense of M&T or paid as part of the settlement. Wesco has offered no reason to believe that Harleysville's incentives were misaligned with what Wesco's would have been had it assumed its duty to defend and indemnify M&T. *See Bunge*, 394 F.2d at 497 (remarking in the context of a settlement negotiated by the insured, "[r]ecognizing the possibility that his suit against the

---

[5] Harleysville also points to Wesco's failure to respond to its Request for Admission No. 23, or to respond to paragraph 28 of its statement of undisputed facts with any particular citation to the record, both of which stated that the "settlement was objectively reasonable." Reply at 15. The Court declines to reach these arguments or Defendant's motion to withdraw deemed admissions, as they are unnecessary to the Court's disposition.

insurance company may fail, the insured will attempt to recoup as much of his losses as possible from the third party."). To the extent that it seems unfair that Wesco is held liable for the costs of a settlement after not having actively participated in the litigation or arm's length negotiations, that is the risk Wesco assumed in breaching its duty to defend. *See Servidone*, 64 N.Y.2d at 424 (discussing how simple fairness requires a breaching insurer to pay a reasonable settlement made without its consent).

Based on the uncontroverted evidence from the Underlying Actions in the record here, including the transcript of the settlement conference before Judge Suddaby, Beer Decl., Ex. V, and in the absence of any direct arguments from Wesco, there is no genuine dispute as to the reasonableness of the settlement amount. As M&T personally contributed $12,500 to the settlement, an amount that was likely to have been paid even if Wesco had defended M&T, and an amount that would be paid in excess of Wesco's coverage limitation of $1,000,000, Harleysville is not entitled to reimbursement of the $12,500. Accordingly, Harleysville is entitled to reimbursement of $1,000,000.

Additionally, under N.Y. C.P.L.R. § 5001, Harleysville is entitled to prejudgment interest on that settlement amount, computed from the date it was incurred – here, December 16, 2016. *See Turner Constr. Co.*, 485 F. Supp. 2d at 490. The amount of prejudgment interest to be awarded pursuant to a breach of contract claim is nine percent per annum. N.Y. C.P.L.R. § 5004.

### D. Plaintiff Is Also Entitled to Its Claimed Costs of Defense and Pre-Judgment Interest

As was determined above, Wesco, in breaching its duty to defend, owes M&T – and by assignment of their rights, Harleysville – "reasonable defense costs including attorney's fees." *U.S. Underwriters Ins. Co. v. Weatherization, Inc.*, 21 F. Supp. 2d 318, 326 (S.D.N.Y. 1998). Plaintiff has submitted itemized invoices from counsel in the Underlying Actions, Wilson Elser

LLP. *See* Beer Decl., Ex. W. In its Rule 56.1 statement, Harleysville avers that it expended

approximately $180,058.20 in defending M&T in the Underlying Actions. Pl. 56.1 ¶ 29. Wesco

disputes this statement, noting that Plaintiff "did not supply certified copies of the bills submitted

by [the law firm] for its defense of M&T in the underlying action, nor did it produce evidence of

its actual payment of said bills." Defs. 56.1 ¶ 29. Wesco cites no law supporting its implied

contention that Plaintiff is required to produce evidence of "actual payment." Moreover, unlike

with Wesco's arguments about the settlement amount, at no point in Defendant's submissions

does it squarely argue that Plaintiff's defense costs were unreasonable. In the absence of any

genuine dispute over the reasonableness of the amount, no reasonable jury could find that

Harleysville was not entitled to reimbursement for its claimed defense costs.

Finally, Harleysville is also entitled to statutory pre-judgment interest under N.Y.

C.P.L.R. § 5001. Interest shall be computed from the time each reimbursable expense was paid,

*see id.* § 5001(b), up until and including the date of judgment, at nine percent per annum. *See id.*

§ 5004.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED and

Defendant's cross-motion to withdraw deemed admissions is DENIED as moot.

This Order resolves Dkt. Nos. 47 & 63. The Clerk of Court is respectfully directed to

close the case and enter judgment for Plaintiff in the amount of $1,180,058.20 ($1,000,000 for

cost of settlement and $180,058.20 in defense costs) plus statutory pre-judgment interest at nine

percent per annum calculated from the time of each payment through the date of judgment.

SO ORDERED.

Dated: March ⟨⟨28⟩⟩, 2018
New York, New York

ALISON J. NATHAN
United States District Judge